UNITED STATES ex rel. Chester SALDIVAR, Plaintiff,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC., Defendant.

Civil Action No. 1:10–CV–01614–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 17, 2013.

**1320**

Jamie M. Bennett, Melissa A. Roover, Nathan M. Peak, Sidney Schupak, Ashcraft & Gerel, LLP, Andrea Solomon Hirsch, Herman Gerel, LLP, for Plaintiffs.

James F. Bennett, Lisa S. Hoopenjans, Megan Heinsz, Dowd Bennett LLP; Joseph Matthew Maguire, Jr., Parks Chesin & Walbert, P.C., for Defendant.

Neeli Ben–David, Mina Rhee, U.S. Attorney's Office–ATL, for United States.

### ORDER

AMY TOTENBERG, District Judge.

This matter is before the Court on Relator Chester Saldivar's Third Motion to Amend his Complaint [Doc. 92–1].[1] Relator has alleged that Defendant has engaged in a fraudulent billing scheme involving medications it received for free from manufacturers and administered to dialysis patients but for which it sought reimbursement from various governmental agencies in violation of the False Claims Act ("FCA"). Relator seeks to amend his Second Amended Complaint to clarify his current claims relating to a nationwide scheme for capturing, administering, and billing for end-stage renal disease medications. Relator also seeks to add claims alleging a different fraudulent billing scheme and alleging a violation of the Anti-kickback Statute that gives rise to an FCA violation. For the reasons set forth below, the Court **GRANTS IN PART** and **DE-** NIES IN PART Relator Saldivar's Third Motion to Amend his Complaint.

## I. BACKGROUND

### A. Relator's Original Theory

Relator is a resident of California, formerly employed by Defendant Fresenius from March 31, 2007 until December 18, 2009. (Compl. ¶ 10, Doc. 1.) Fresenius is headquartered in Massachusetts and is the country's largest dialysis services provider. (*Id.* ¶¶ 2, 11.) As such, Fresenius is entitled to reimbursement from federal health care programs (e.g., Medicare and Medicaid) for costs associated with covered patient treatment. (*Id.* ¶ 2.) In addition to composite payments for its routine dialysis treatment regime, Fresenius is entitled to separate reimbursement for certain injectable medications that it purchases and administers to dialysis patients. (*Id.* ¶ 22.) At issue in this case are Fresenius's billing practices for two such medications: Zemplar (a Vitamin D analog) and Epogen (a synthetic erythropoietin derivative hormone used to lessen the effects of anemia). (*Id.* ¶¶ 3, 18–19.) Relator contends that during and by virtue of his employment with Fresenius, he learned that Fresenius bills the Government for doses of Zemplar and Epogen that it receives for free, resulting in Fresenius's submission of an estimated "hundreds of millions of dollars" in fraudulent reimbursement claims. (*Id.* ¶¶ 4, 47, 87.)

Consistent with industry standards, manufacturers of Zemplar and Epogen, Abbott Laboratories ("Abbott") and Amgen, Inc. ("Amgen"), respectively, include in each vial a surplus volume of each drug, referred to as "overfill." (*Id.* ¶ 37.) For example, a 5–unit vial of Zemplar may, in

---

1. Plaintiff Saldivar brought this claim as a *qui tam* relator. The United States Government is the real party in interest, though the Government declined to intervene on Mr. Saldivar's action. The Court addresses the parties' cross-motions for summary judgment [Docs. 93, 100] in a separate order.

fact, contain 6 units of the drug. Relator contends that dialysis-care providers have two legitimate options with respect to overfill volumes: (1) discard the excess drug in situations where the Centers for Medicare and Medicare Services ("CMS") prohibit re-entry into a vial, or (2) administer the drug, where permitted, and reduce the amount sought for reimbursement to reflect only actual costs incurred. (*Id.*) Relator alleges, instead, that Fresenius unlawfully collected, tracked, administered, and billed the Government for overfill volumes of both Zemplar and Epogen. (*Id.* ¶ 47.) In short, Relator contends that, rather than discard overfill, Fresenius fraudulently billed the Government for administrations of Zemplar and Epogen that it received for free. (*Id.* ¶ 4, 47.)

Relator bases these allegations on information learned during his employment with Fresenius. (*Id.* ¶ 47.) When Relator began working for Fresenius in March of 2007, he was employed as an Equipment Technician at Fresenius's Los Angeles South and Nevada Region clinics. (*Id.* ¶ 50.) In January of 2008, Fresenius expanded Relator's job requirements to include primary responsibility for the clinics' Zemplar inventory. (*Id.* ¶ 64.) Relator alleges that while creating monthly Zemplar reports, he observed that Zemplar overfill accounted for up to 30% of the total doses that Fresenius administered at clinics. (*Id.* ¶ 65.)

During that time, Relator contends that Fresenius's corporate headquarters regularly sent monthly and quarterly reports to clinic supervisors "reminding [them] of the company's overfill percentage goals, and listing clinic performance nationwide in terms of overfill percentage for Epogen and Zemplar administered to patients." (*Id.* ¶ 51.) Overfill requirements, as developed by corporate headquarters, were often the subject of conversations between Relator and Fresenius clinical managers. (*Id.* ¶ 53.)

In September of 2009, Fresenius expanded Relator's job to include Epogen inventory work. (*Id.*) In this position, Relator learned directly from a Fresenius clinic manager that the need to keep overfill percentages for Epogen would be high, as it had been for Zemplar. (*Id.*) At that time, both Zemplar and Epogen inventory forms tracked total administered doses (both with and without overfill use) and highlighted the overfill percentage of administered doses. (*Id.* ¶ 55.) By virtue of his inventory-based work, Relator noted that the total administered doses at a given clinic never equaled the total available drug amount from the clinic inventory, suggesting the inclusion of overfill in Fresenius's reporting of administered doses to the Government. (*Id.* ¶ 56.) Because Fresenius's reimbursement bills did not compare total administered doses with the total number of vials purchased, Relator contends that the Government remained unaware of this discrepancy. (*Id.* ¶ 57.) For example, Relator alleges that in October of 2008, Fresenius billed Medicare for a total of 762,000 units, even though it incurred acquisition costs for only 680,000 of those units. (*Id.* ¶ 77.)

Relator also identified discrepancies between the number of Epogen vials reported and the number of Epogen vials he observed in inventory counts. (*Id.* ¶ 59.) Because he was required to sign and personally attest to the accuracy of the Epogen inventory count, Relator contends he was concerned about the provision of false information. (*Id.*) Accordingly, Relator expressed his concerns to Fresenius's management, who subsequently suspended him for an "investigatory period" beginning in March of 2009. (*Id.* ¶ 60.) Relator alleges Fresenius ultimately terminated

him without explanation in December of 2009. (*Id.*)

Relator sued Defendant in this Court on January 24, 2011, alleging several claims:

- Count 1: Violation of the FCA for submitting false or fraudulent claims with respect to Zemplar overfill reimbursement and making false records or statements material to such claims;
- Count 2: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Zemplar overfill reimbursement as described in Count 1;
- Count 3: Violation of the FCA by submitting false or fraudulent claims with respect to Epogen overfill reimbursement and making false records or statements material to such claims;
- Count 4: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Epogen overfill reimbursement as described in Count 3; and
- Counts 5–22: Violation of various state-law False Claims Act equivalents.

On December 14, 2011, Relator filed a Motion to Amend his Complaint to add an additional claim under the federal FCA. (Mot. Leave File 2d Am. Compl. ("SAC"), Doc. 49.) This claim alleged Defendant retaliated against Relator by suspending and later terminating his employment in violation of 31 U.S.C. § 3730(h). (SAC ¶¶ 112–114, Doc. 49–1.) As Defendant did not oppose this motion (Resp. Mot. Leave File SAC, Doc. 52), the Court granted leave to amend on March 26, 2012. *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.,* 906 F.Supp.2d 1264, 1278 (N.D.Ga.2012). In that same Order, the Court granted in part and denied in part Defendant's Motion to Dismiss. Relator's sundry state law false claims were dismissed, but the Court found the Second Amended Complaint alleged federal FCA violations with sufficient particularity to meet the pleading requirements of Fed.R.Civ.P. 9(b) regarding the Fresenius clinics (Los Angeles South and Nevada) where Relator had personal knowledge. *Id.*

## B. Relator's Additional Theories

Relator believed he offered sufficient facts to support allegations of a nationwide scheme to defraud, and on April 23, 2012 filed a Motion for Reconsideration of the Court's March 26, 2012 Order. (Mot. Recons., Doc. 63.) Relator also asked, in the alternative, for leave to file an Amended Complaint containing more particular allegations of the nationwide scheme. (*Id.*) On May 21, 2012, the Court conducted a telephone conference with the parties, directing them to focus discovery on whether a nationwide corporate policy existed regarding billing for administered overfill. (Tr. May 21, 2012 Status Conference Proceedings ("May 21 Conf.") 16:14–18:2, Doc. 71.) Because the conference made Relator's motion moot, the Court denied the Motion for Reconsideration or to Amend the Complaint but indicated Relator would have the opportunity to file a Third Amended Complaint should the focused discovery produce sufficient evidence. (Minute Entry Entered May 22, 2012, Doc. 68.)

Amidst this directed discovery process, the Court conducted another telephone status conference. During this conference the parties discussed discovery documents that "disclosed the existence of a nationwide plan to capture, administer, and bill Medicare for both Epogen and Zemplar."

(Tr. Oct. 3, 2012 Telephone Conference Proceeding ("Oct. 3 Conf.") 4:1–4:3, Doc. 116.) Defendant did not dispute this practice, but instead questioned "whether there is any sort of rule at all that prohibits the conduct at issue." (*Id.* 6:17–6:22.) As a result, Relator filed his third Motion to Amend a Complaint on December 4, 2012. (Mot. Leave File 3d Am. Compl. ("TAC"), Doc. 92.) In addition to providing more detail relating to the nationwide scheme for Counts 1–4 as the parties discussed, Relator added four additional counts:

- Count 5: Violation of the FCA by submitting false or fraudulent claims with respect to administered doses of Epogen greater than the amount physically present in the vials;

- Count 6: Violation of the FCA by concealing or improperly avoiding or decreasing its own obligation to reimburse the Government for Epogen overfill reimbursement as described in Count 5;

- Count 7: Violation of the FCA by submitting false or fraudulent claims seeking reimbursement for vials of Zemplar that were subject to payment of kickbacks in violation of the Anti-kickback Statute; and

- Count 8: Violation of the FCA by submitting false or fraudulent claims seeking reimbursement for vials of Epogen that were subject to payment of kickbacks in violation of the Anti-kickback Statute.

---

**2.** "*Qui tam* is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur,*' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 768 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

**3.** The Fraud Enforcement and Recovery Act (FERA) of 2009 amended and renumbered the False Claims Act. 31 U.S.C. § 3729(a)(1) be-

Additionally, the Third Amended Complaint renumbered Relator's retaliation claim as Count 9.

Along with the Motion to Amend, both parties have filed cross-motions for summary judgment. (Relator's Cross Mot. Partial Summ. J., Doc. 93; Def.'s Mot. Summ. J. Counts I–IV, Doc. 100.) These cross-motions address whether statutes and regulations existed during the relevant time period that barred Fresenius from billing Medicare for recaptured overfill. (*See* Docs. 93, 100.) The Court addresses the cross-motions in a separate Order.

## II. LEGAL FRAMEWORK

### A. False Claims Act ("FCA")

A *qui tam*[2] relator may bring an action on behalf of the Government for a violation of the FCA and recover significant damages. 31 U.S.C. § 3730(b), (d)(2). In Counts 1, 3 and 5 of his Third Amended Complaint, Relator Saldivar alleges Fresenius violated FCA sections (a)(1)(A) and (a)(1)(B). These sections impose civil liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to which the Government sustains damages because of the person's actions. 31 U.S.C. § 3729(a)(1)(A, B).[3] In Counts 2, 4 and 6 of his Third Amended Complaint, Relator Saldivar alleges Fre-

came § 3729(a)(1)(a), while 31 U.S.C. § 3729(a)(2) became § 3729(a)(1)(B), and the words "to get a false or fraudulent claim paid or approved by the government" were replaced by the words "material to a false or fraudulent claim." *See Hopper v. Solvay Pharms., Inc.,* 588 F.3d 1318, 1323 n. 2 (11th Cir.2009); *see also id.* at 1327 n. 3. Whether the pre- or post-FERA version applies to this matter does not affect the analysis.

senius violated section 3729(a)(1)(G), which imposes civil liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money ... to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money ... to the Government." 31 U.S.C. § 3729(a)(1)(G).

Additionally, a relator may bring a claim for relief if he is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of an action under this section or other efforts to stop [a FCA] violation[ ]." 31 U.S.C. § 3730(h)(1). Relator Saldivar brings allegations that Fresenius violated this section of the FCA in Count 9 of his Third Amended Complaint "in retaliation for lawful acts done by Mr. Saldivar." (TAC ¶ 180.)

### B. Anti-kickback Statute

Counts 7 and 8 of Relator Saldivar's Third Amended Complaint seek to add new claims against Fresenius under the FCA for submitting claims that arise from a violation of section (b) of the federal Anti-kickback Statute. This section considers a violation for "whoever knowingly and wilfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" when that remuneration is given "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1)(B).

### III. LEGAL ANALYSIS

The Court's determination of whether to grant leave to amend requires two levels of analysis, specifically (1) whether Relator followed the appropriate procedural requirements with respect to amending FCA *qui tam* complaints, and (2) whether Relator's Motion to Amend comports with the pleading standards of Fed.R.Civ.P. 15(a). The Court considers each question in turn.

### A. FCA Procedural Requirement

Defendant's first and primary argument against Relator's request to amend involves Relator's alleged failure to comply with the statutory requirements for *qui tam* causes of action. Generally, relators must comply with specific requirements when filing a complaint, including serving the Government with the complaint while it remains sealed until the Government determines whether it wants to intervene:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

31 U.S.C. § 3730(b)(2). Relator met these requirements for his original complaint, but did not follow the same procedure for his Third Amended Complaint.

Defendant contends this failure frustrated the Government's opportunity to intervene on the new claims in contravention of section 3730(b)(2)'s legislative purpose. (*See* Resp. Opp. TAC at 4–11, Doc. 98.) Defendant proffers several cases describ-

ing the importance for the amended complaint to comply with § 3730(b)(2) when the original complaint *lacks* a *qui tam* claim, but none are directly on point. For example, in *United States ex rel. Anderson v. ITT*, No. 1:05CV720, 2006 WL 4117030, at *2–3 (E.D.Va. Jan. 11, 2006), *aff'd* 201 Fed.Appx. 964 (4th Cir.2006), relators requested to amend their complaints to *add* a *qui tam* claim. In *Anderson*, the court denied the request to amend because the Government never had the opportunity to intervene. Here, on the other hand, the Government studied Relator Saldivar's claim, but declined to intervene. (*See* Gov't's Notice of Election to Decline Intervention, Doc. 24.) In that sense, *United States ex rel. Ubl v. IIF Data*, No. 1:06–cv–641, 2009 WL 1254704 (E.D.Va. May 5, 2009) is more on point. In *Ubl*, the government had already been served with the complaint and relator's new claims were not materially different from those in the original complaint. *Id.* at *1–3. There, the court denied the defendant's Motion to Dismiss, finding a failure to comply with section 3730(b)(2) does not extinguish a court's subject matter jurisdiction. *Id.*

Defendant also cites numerous other inapposite cases: *Foster v. Savannah Commc'n*, 140 Fed.Appx. 905, 908 (11th Cir.2005) (affirming complaint's dismissal for failure to comply with any procedural requirements, and filing after the statute of limitations passed); *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 999 (2d Cir.1995) (original complaint not filed according to procedural requirements); *Erickson ex rel. United States v. Am. Inst. of Biological Scis.*, 716 F.Supp. 908, 919 n. 25 (E.D.Va.1989) (same); *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1259–60 (11th Cir.2008) (denying request to amend non-*qui tam* complaint to add *qui tam* claims, because the procedural requirements of § 3730(b)(2) had never been met); *United*

*States ex rel. Joshi v. St. Luke's Hosp.*, 441 F.3d 552, 558–59 (8th Cir.2006) (finding that allowing amendment would not resolve the complaint's particularity issues regardless of § 3730's procedural requirement); *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 242 (1st Cir.2004) (same); *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 658 n. 10 (5th Cir.2004) (discussing as dicta the procedural requirements of § 3730, but ultimately dismissing the complaint on other grounds).

Even the lone case Defendant cites as factually similar to its position addresses only in dicta whether a relator may amend a *qui tam* complaint to add new claims. *United States ex rel. Davis v. Prince*, 766 F.Supp.2d 679, 684 (E.D.Va.2011) (using statutory construction principles to determine an *amended* complaint constitutes a complaint and thus requires full compliance with § 3730(b), including re-sealing the complaint and re-serving the Government to provide a new opportunity to determine whether to intervene, but ultimately determining relators' amended complaint did not substantially differ from their original complaint, rendering the sealing requirement moot). *Davis* seems to represent the extreme minority position.

Many district courts have found section 3730(b)(2) requirements do not apply to amended *qui tam* complaints, particularly when the Government has had its opportunity to consider intervention and the amendment does not add new claims. *See, e.g., United States ex rel. Branch Consultants, LLC v. Allstate*, 668 F.Supp.2d 780, 803 (E.D.La.2009) (adding additional details to an existing complaint); *Wisz ex rel. United States v. C/HCA Dev., Inc.*, 31 F.Supp.2d 1068, 1069 (N.D.Ill.1998) (same); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F.Supp. 868, 890 (D.Md.1995) (adding more defen-

dants); *Ubl,* 2009 WL 1254704, at *4 (adding specificity to allegations); *see also United States ex rel. Yannacopoulos v. Gen. Dynamics,* 235 F.R.D. 661, 665–66 (N.D.Ill.2006) (finding § 3730(b) procedural compliance non-mandatory in the context of disclosure statements when adding additional claims). Defendant has no issue with an amended complaint that adds color to existing claims. Rather, Defendant argues that Relator's Third Amended Complaint is offering new claims and thus must comply with section 3730(b)(2).

While neither the Eleventh Circuit nor other judges in the Northern District of Georgia have spoken on this issue, other districts have contemplated amendments that add new claims. The Northern District of Illinois found section 3730(b)(2)'s requirements procedural rather than jurisdictional, thus giving the court discretion to allow amendment under a Rule 15 standard. *United States ex rel. King v. F.E. Moran, Inc.,* No. 00 C 3877, 2002 WL 2003219, at *12–13 (N.D.Ill. Aug. 29, 2002). The Eastern District of Washington has held similarly. "No provision of the False Claims Act explicitly authorizes dismissal as a sanction for disclosures in violation of the seal requirement." *United States ex rel. Stewart v. Altech Servs., Inc.,* No. CV–07–0213–LRS, 2010 WL 4806829, at *2 (E.D.Wash. Nov. 18, 2010). The *Stewart* court went on to say, "the Court [further] finds defendants' argument lacks merit because by its terms, § 3730(b)(2) applies only to the complaint and not to any amended complaint." *Id.* Finally, the Middle District of Florida recently allowed for an amended *qui tam* complaint that added a count, without mention of any section 3730(b)(2) concerns. *United States ex rel. Dittman v. Adventist Health Sys./Sunbelt, Inc.,* No. 6:10–cv–1062–Orl28GJK, 2013 WL 615820, at *1 (M.D.Fla. Feb. 19, 2013) (Antoon, J.).

The primary concern Defendant has voiced about amending *qui tam* complaints to add claims seems to arise because the Government lacks the opportunity for a "confidential and unhurried investigation of the new claims" by Relator not serving his amended complaint to the Government under seal. *See Davis,* 766 F.Supp.2d at 684 (quoting John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.04[C] (4th ed. 2013)). However, the Government can still intervene upon showing good cause. 31 U.S.C. § 3730(c)(2)(D)(3); *see also United States ex rel. Walle v. Martin Marietta Corp.,* No. 92–3677, 1994 WL 518307, at *2 (E.D.La. Sept. 21, 1994) (granting leave to amend and add a new claim after discovery because "the Government has statutory authority to intervene at a later date," and further stating "[t]he Court is not persuaded by Marietta's concern for the Government" because "NASA is not going to walk away from any viable allegations that might put money back into the Government's pocket").

■ In this situation, the Government had the opportunity to review Relator's complaint and declined to intervene, though it has requested service of all subsequent pleadings. (*See* Gov't's Notice of Election to Decline Intervention at 2, Doc. 24.) Relator has complied with the Government's request, keeping it informed of the case's progress. If the Government reconsiders its desire to intervene, the possibility of which the *Walle* court intimated, it need only show good cause to become an active participant. 31 U.S.C. § 3730(c)(2)(D)(3). The 1986 FCA Amendments specifically provided the Government this "backdoor" opportunity to participate in the proceedings despite declining intervention initially, because the Government remains the real party in interest. *See, e.g., United States ex rel. Killingsworth v. Northrop Corp.,* 25 F.3d

715, 721 (9th Cir.1994) (discussing False Claims Act legislative history).

The Court also has its own concerns that requiring a new confidential filing risks stagnation of evidence and unnecessary prolonging of this case in which discovery has already commenced. If the Government reviews the resealed Third Amended Complaint according to the same schedule it followed with Relator's initial complaint, full section 3730(b)(2) compliance could add at least ten more months before Defendant begins preparing a defense to these amendments.[4] Ultimately, this point is moot because Defendant *did* receive service and the Government *can* intervene. As such, the Court finds section 3730(b)(2) provides no statutory bar preventing Relator's Motion to Amend, and thus moves on to evaluate Relator's Motion to Amend under Rule 15.

## B. Relator's Motion to Amend

The Court now turns to the merits of Realtor's Third Motion to Amend the Complaint. First, Relator moves to amend Counts 1–4 to allege a nationwide scheme for recapturing and billing overfill to the Government.[5] Defendant does not oppose the Third Amended Complaint as it relates to the alleged nationwide scheme for recapturing and in fact admits that the billing practice at issue occurred corporation-wide. (*See* Castle Decl. ¶ 24, Doc. 100–4 ("[Fresenius] has openly invoiced and received reimbursement from the Medicare program at the per–1000–units

(Epogen®) or per-microgram (Zemplar®) rates established by CMS for the Medicare program without regard to whether some or all of the medication actually administered to particular patients can literally be attributable to the 'overfill' portion of the medication in the vial."); *see also* Oct. 3 Conf., 5:17–5:18, 7:23–7:25 ("I agree that discovery to date on the deposition front has focused in on our national practice ... [so] we're prepared to file a motion for summary judgment on the legal question of whether this [national practice of capturing and billing the Government for overfill] is prohibited at all.").) Therefore, Relator's request for Leave to File a Third Amended Complaint is **GRANTED** as it relates to Counts 1–4.

In Counts 5 and 6, Relator alleges that Fresenius not only billed for overfill in violation of Medicare rules and regulations, but also billed for non-existent overfill—so-called "ghost drug" that was not present in the vial and thus not administered to patients. In Counts 7 and 8, Relator alleges that Fresenius's overfill billing practice arose from negotiations with drug manufacturers that included kickbacks, amounting to a violation of the Anti–Kickback Statute. Relator alleges that any claim submitted to the Government in violation of the Anti-kickback Statute is itself an FCA violation. The Court now considers the Relator's Third Motion to Amend the Complaint to add these four counts.

4. Relator filed his initial complaint on May 26, 2010, and, after two extensions, the Government declined intervention on March 24, 2011, finally resulting in the Complaint's unsealing and service on Defendant.

5. The Court already determined that Relator's allegations regarding overfill recapturing events occurring in Los Angeles South and Nevada were based on Relator's firsthand knowledge, thus meeting the *Clausen* "indicia

of reliability" standard. *Saldivar*, 906 F.Supp.2d at 1277 ("While employed with Defendant, Relator compiled reports that compared total doses of Zemplar and Epogen administered with total doses in inventory, noting separately the total percentage of overfill used for each drug. According to Relator, his clinical manager informed him that those documents were used as the basis upon which Defendant billed for reimbursement.").

### 1. Legal Standard for Motions to Amend the Complaint

■ Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading (1) once as a matter of course within 21 days after serving it, or (2) 21 days after service of a motion or responsive pleading. Fed.R.Civ.P. 15(a)(1). If a party seeks to amend its pleading outside these time limits, it may do so only by leave of court or by written consent of the adverse party. Fed. R.Civ.P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.;* accord *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Shipner v. E. Air Lines, Inc.,* 868 F.2d 401, 406–407 (11th Cir.1989) ("Rule 15(a) severely restricts the district court's freedom, directing that leave to amend shall be freely given when justice so requires."). Rule 15(a)'s liberal policy of "permitting amendments to facilitate determination of claims on the merits circumscribes the exercise of the district court's discretion; thus, unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* at 407. Thus, the Court should deny leave to amend only where the amendment will result in undue delay, bad faith, undue prejudice, a repeated failure to cure deficiencies by amendments previously allowed, or futility. *Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Hall v. United Ins. Co. of Am.,* 367 F.3d 1255, 1263 (11th Cir.2004) ("[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.") (quoting *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1320 (11th Cir.1999)); *cf. Bryant v. Dupree,* 252 F.3d 1161, 1163–64 (11th Cir.2001) (reversing district court's decision to deny leave to amend a complaint because there was no evidence of prejudice to the defendant).

■ A complaint is futile, *inter alia,* if it would be subject to dismissal for failing to state a claim for which relief can be provided. *See Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1015 (11th Cir.2005) (affirming district court's denial of leave to amend a *qui tam* relator's FCA complaint because proposed amendments "failed to plead specific instances of fraudulent submissions to the government"); *see also Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1255 (11th Cir.2008) ("Because justice does not require district courts to waste their time on hopeless cases, leave may be denied if a proposed amendment ... fails to state a claim."); *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). *Iqbal* requires more than facts that are "merely consistent with a defendant's liability" to achieve plausibility. *Id.* at 678, 129 S.Ct. 1937 (internal quotations omitted).

■ Finally, the Court may decline leave to amend based on matters complained of by Defendant or based on issues identified *sua sponte. See United States ex rel. Brunson v. Narrows Health and Wellness, LLC,* 469 F.Supp.2d 1054, 1055 (N.D.Ala.2007) (stating that the court "without defendant's help, finds several good reasons why plaintiffs' motion [to amend] should be denied," including undue, unexplained delay, prejudice to the defendant, and lack of particularity). Whether to permit amendment is a legal determination for the Court, subject to *de novo* appellate review. *Mizzaro,* 544 F.3d at 1236.

Defendant argues that Counts 5–8 lack particularity required for FCA and Anti-Kickback claims, that Counts 5 and 6 are contrary to the evidence, that Relator can-

not establish the requisite intent for Counts 7 and 8, that the statute of limitations bars Counts 7 and 8, and that the Third Amended Complaint is unduly delayed. The Court begins with Counts 5 and 6.

## 2. Counts 5 and 6: Billing for Ghost Drug

In Counts 5 and 6, Relator essentially alleges that Fresenius billed Medicare for overfill that did not exist (so-called "ghost drug") and thus was not administered to patients. Counts 5 and 6 are two sides of the same coin. While in Count 5 Relator alleges billing the Government for overfill not present in the Epogen vials in violation of either 31 U.S.C. § 3729(a)(1)(A) or § 3729(a)(1)(B), in Count 6 he alleges a "reverse" false claim, claiming that Fresenius failed to reimburse the Government for those payments in violation of 31 U.S.C. § 3729(a)(1)(G). *See United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1222 (11th Cir. 2012) (discussing the difference between "avoiding the payment of money due to the government, as opposed to submitting to the government a false claim").[6] As both

Counts 5 and 6 turn on the Relator's allegations of billing for ghost drug, the Court analyzes them together. As such, the Court concludes that Plaintiff's allegations regarding ghost billing appear implausible as alleged. In any case, the Court finds that Relator has failed to allege this theory of liability for Counts 5 and 6 with the level of particularity required for an FCA claim.[7]

### a. *Implausibility*

Relator's main factual allegations to support his theory of liability in Counts 5 and 6 involve alleged incidents of Fresenius billing for more overfill than the average amount of overfill contained in a vial, as reported by the manufacturer. As explained below, while these allegations have superficial appeal, upon closer examination, it becomes clear that these allegations are internally inconsistent, which the Court need not accept as true. *See Sterling v. Provident Life & Accident Ins. Co.,* 519 F.Supp.2d 1195, 1209 (M.D.Fla.2007) ("While courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductive there from, they need not accept

6. For Relator's reverse false claim allegation, he must put forth sufficient facts showing: (1) a false record or statement; (2) Fresenius's knowledge of the falsity; (3) that Fresenius made, used, or caused to be made or used a false statement; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the Government; and (5) that misrepresentation was material. 31 U.S.C. § 3729(a)(1)(G); *Matheny,* 671 F.3d at 1222.

7. The Court is not entirely sure what facts allegedly give rise to Counts 5 and 6 as Relator did not provide direction as to where he describes these allegations in his 75–page, 181–paragraph Third Amended Complaint. Instead, Relator "realleges and incorporates by reference the allegations contained in paragraphs 1 through 138" of his complaint. (3d Am. Compl. ("TAC") ¶¶ 159, 164.) As the Court explains later in this Order, the Eleventh Circuit has announced unequivocally its

disfavor for "shotgun" pleadings that incorporate immaterial allegations of fact from preceding counts making it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla.,* 77 F.3d 364, 366 (11th Cir.1996); *see also Davis v. Coca–Cola Bottling Co. Consol.,* 516 F.3d 955, 981–83 (11th Cir.2008) (discussing the myriad parasitic consequences that attach to shotgun complaints). Certainly the allegations regarding Epogen are irrelevant to allegations regarding Zemplar. Ultimately, whether or not Relator's complaint constitutes a shotgun pleading is immaterial. After spending significant time poring over the Third Amended Complaint, the Court finds the allegations for Counts 5 and 6 lack the particularity necessary to state a claim under Rule 9(b).

factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions; or mere legal conclusions asserted by a party.") (quoting *Frenck v. Corr. Corp. of Am.*, No. 8:06–cv–1534–T–17EAJ, 2006 WL 3147656 (M.D.Fla. Nov. 1, 2006) (Kovachevic, J.)); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2002) ("The court will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself."); *Scott v. O'Grady,* 975 F.2d 366, 368 (7th Cir.1992) ("[Courts] are not obliged to ignore any facts in the complaint that undermine the plaintiff's claim."). Accordingly, most of Relator's allegations fail to make Relator's theory of liability in Counts 5 and 6 any more plausible.

The crux of Relator's conclusory leap is his misapplication of the principle of averages to establish an exact amount, rather than a range of volumes. First, Relator alleges that Fresenius instructed its staff to recover more overfill than what was physically present in the vials, but Relator's own allegations suggest otherwise. (TAC ¶ 66.) According to Relator, in 2009 Fresenius's target overfill *range* was 10% to 13%. (*Id.*) During that time, Relator claims Amgen's average amount of overfill in a vial was 11.1%. (*Id.* ¶ 70) This *average* is comfortably within Fresenius's target *range.* And the *range* naturally accounts for situations where Amgen provided both more and less Epogen than its reported average. One clinic may have received those vials with 12–15% overfill, while another may have received those vials with 7–10% overfill. The range clinics are encouraged to recover suggests awareness of this variability from vial to vial, but does not suggest an active encouragement of billing for non-existent drug. Thus, contrary to Relator's allegations, Fresenius's target range is consistent with, not greater than, Amgen's reported average. As such, Relator's allegations here do not support his theory of liability in Counts 5 and 6. (*See also id.* ¶ 62 (noting that, in 2006, Fresenius's Task Force set the target utilization for Epogen overfill at 10.5%, which was *less* than the reported average).)

Second, relying solely on Exhibit B to the Third Amended Complaint (Doc. 95–2), Relator points to incidents of Fresenius clinics allegedly billing for more overfill than was physically present in a vial:

> For example, as Exhibit B to this Complaint illustrates, although the amount of overfill Amgen reported *was physically present* in Epogen vials in 2009 *was 11.1%,* many Fresenius clinics were billing Medicare and other federal health benefit programs (and also private insurers) for drugs *considerably in excess of that amount of overfill.*

(*Id.* ¶ 70 (emphasis added).) The crux of this allegation is that "the amount of overfill Amgen reported was physically present in Epogen vials in 2009 was 11.1%." (*Id.* (emphasis added).) But again, this assertion is inconsistent with Relator's allegations elsewhere. According to paragraph 66 of the Complaint, it is not the amount of overfill in each vial that equals 11.1%. It is the average amount. (*Id.* ¶ 66.)

The difference between *actual amount* and *average amount* is not just semantic. *Actual* implies something "existing in fact; real." Black's Law Dictionary 40 (9th ed. 2009). Comparatively, *average* denotes "[a] single value that represents the midpoint of a broad sample of subjects." *Id.* at 115. Logically, then, sometimes the vial contains more and sometimes less, and it is

expected that sometimes that amount is significantly more or significantly less. Thus, a few clinics extracting more than the average does not necessarily make any more plausible Relator's allegation that such clinics extracted more than was actually present.

This can be understood by considering a more complete sample of overfill recapturing rather than a few cherry-picked examples of higher-than-average overfill inclusion. In Exhibit B of the Third Amended Complaint, the "efficiency" spreadsheet Relator provided to support his allegations, overfill recapture amounts vary significantly. Based on this Exhibit, the court calculated the average overfill obtained in each time period from the first 403 clinics (totaling 2,369 samples) with the following results:

- 7/31/2009 = 10.625%
- 8/31/2009 = 10.529%
- 9/31/2009 = 9.333%
- 10/31/2009 = 9.717%
- 11/31/2009 = 10.046%
- 12/31/2009 = 10.327%
- Overall efficiency = 10.096%

(*See* TAC, Ex. B at 1–7, Doc. 95–2, comprising a dataset of clinics from Facility 1028 through 4388.)

Importantly, for each time period, the average amount collected (range: 9.3%–10.6%) and the overall average amount collected (10.1%) are *less than* the average amount that Relator alleges was contained in Amgen vials (11.1%).[8] Thus the document referenced in Relator's complaint does not appear to support his allegations regarding billing for ghost drugs.[9] Assuming as true the facts Relator provides, the Court easily can envision a scenario where some Fresenius clinics got lucky by receiving vials containing the upper range of overfill while others received short shrift. This random distribution simply supports the premise that Amgen provided an average of 11.1% overfill to its myriad recipient clinics and Fresenius recovered overfill consistent with that average.

Relator provides other factual allegations to support his claim that Fresenius billed for overfill that did not exist, but most of these allegations essentially derive from the same failure to distinguish among the terms *average, actual amount,* and *range.* (*See, e.g.,* TAC ¶¶ 67–68 (noting that Fresenius put pressure on staff to meet its targets); *id.* ¶ 72 (alleging that Fresenius knew its staff were billing for overfill in excess of the reported average and stating, contrary to Exhibit B of the Third Amended Complaint, that this excess billing occurred on a regular basis).)

8. Although the Court does not consider evidence beyond the pleadings in assessing Relator's Third Motion to Amend, the Court notes that the allegations Relator claims are supported by Exhibit B (Doc. 95–2) are not only inconsistent with that Exhibit, but are also inconsistent with documents provided to the Court in support of Relator's Motion for Summary Judgment. (*See, e.g.,* Amgen Correspondence Group Ex. B at 4–5, Doc. 100–5 (reporting Amgen's overfill of 16.8% in 2002 represented a permissible range from 12.8% to 20.8% depending on the filling equipments' calibration).).

9. Courts in other districts have held that the document referenced in a plaintiff's complaint controls if the allegations in the complaint differ from the document's contents. *See, e.g., Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg,* 882 F.Supp. 713, 718–19 (N.D.Ill. 1995) (determining that attached contract language differed from alleged language in the complaint, and thus the contract controlled); *accord United States ex rel. Sommer v. Dixon,* 524 F.Supp. 83, 84–85 (N.D.N.Y. 1981) (finding that correctional facility Superintendent's Proceeding Report differed from *pro se* plaintiff's allegations that he was not afforded due process, and thus the Report controlled).

The only factual allegation the Court finds that arguably supports Relator's theory of the case—and is not contradicted elsewhere in his proposed Third Amended Complaint or attachments—is found in paragraph 73. There, Relator suggests "that it was not possible to reliably extract more than 10% overfill from Epogen vials under any circumstance." (*Id.* ¶ 73.) Assuming this allegation to be true, Fresenius's reported extraction of more than 10% supports, albeit by a thin thread, Relator's theory that Fresenius reported ghost drug. Absent this factual allegation, the Court could rightly conclude that Relator's theory of liability in Counts 5 and 6 comprises 'naked assertion[s]' devoid of 'further factual enhancement,'" and thus is subject to dismissal. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). In any case, as the Court explains below, Relator's allegations supporting Counts 5 and 6 lack the necessary particularity or indicia of reliability required for FCA claims. On this basis, the Court denies Relator's Motion to Amend to add Counts 5 and 6.

### b. Lack of Particularity

■ FCA claims must be pled with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308–09 (11th Cir. 2002). This serves to put the defendant on notice of "the precise misconduct with which they are charged" and additionally "protect[s] defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l*, 256 F.3d 1194, 1202 (11th Cir.2001). To comply with these requirements Relator's Complaint must set forth facts as to the who, what, when, where, and how of the fraud. *Clausen*, 290 F.3d at 1310; *see also Matheny*, 671 F.3d at 1222 (requiring a Relator to specify details regarding "defendants'

fraudulent act, when they occurred, and who engaged in them").

In Count 5, Relator's allegations present two kinds of FCA claims: a "presentment" claim and a "use" claim. First, Relator alleges that Fresenius violated 31 U.S.C. § 3729(a)(1)(A) by "knowingly *present[ing]* or caus[ing] to be presented, false or fraudulent claims to the United States Government for payment or approval" to induce the Government to pay false claims related to Epogen and Zemplar overfill. (*See* TAC ¶¶ 141, 151, 161, 171, 176, Counts 1, 3, 5, 7, 8 (emphasis added).) This type of claim is known as a "presentment" claim. Relator also alleges that Fresenius "made, *used* or caused to be made or used false records and statements material to false claims" relating to this overfill, in violation of 31 U.S.C. § 3729(a)(1)(B). (*See* TAC ¶¶ 141, 146, 151, 156, 161, 166, 171, 176, Counts 1–8 (emphasis added).) Relator's second claim, known as a "use" claim, is governed by section 3729(a)(1)(B). *Presentment* and *use* claims have different elements. Thus, the Court considers each separately.

### i. Relator's Presentment Claim for Counts 5 and 6 Pursuant to 31 U.S.C. 3729(a)(1)(A)

■ To allege a presentment violation under 31 U.S.C. § 3729(a)(1)(A), a relator must plead: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false." *United States ex rel. Stephens v. Tissue Sci. Labs.*, 664 F.Supp.2d 1310, 1315–16 (N.D.Ga.2009) (quoting 31 U.S.C. § 3729(a)(1), which was later recodified at § 3729(a)(1)(A) (*see supra* note 3)). For FCA presentment claims, Rule 9(b)'s particularity requirement generally applies to both the details of the false claim and the presentment of that claim to the Govern-

ment for payment. *Clausen*, 290 F.3d at 1311. For example, the court in *Clausen* stated, "Rule 9(b)'s directive ... does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 1311. The court continued by saying, "[A]s with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

■■■ Relator's theory of *presentment* liability for Counts 5 and 6 is that Fresenius billed the Government for nonexistent overfill. Relator does not allege a specific presentment to the Government that reflects this ghost drug billing. Instead, the Relator asserts that ghost drug billing must have occurred based largely on the data contained in Exhibit B to the proposed Third Amended Complaint. (*See* TAC, Ex. B., Doc. 95–2.) Relator asserts that this Exhibit provides "more detail [to] show[ ] that many clinics were billing for significant amounts of overfill that did not physically exist." The Court does not interpret Exhibit B the same way.

Exhibit B of the Third Amended Complaint shows no indication of bills presented to the Government related to ghost drug billing. (TAC ¶ 71.) Instead, Exhibit B shows only the volume each clinic recaptured. Exhibit B does not indicate

that the purported volume of overfill captured was actually non-existent. Nor does Relator allege who reported overfill that did not exist, how they did so, or when it was done. As such, Relator fails to allege the specific "time, place, and substance of [Fresenius's] alleged fraud." *Klusmeier v. Bell Constructors, Inc.*, 469 Fed.Appx. 718, 721 (11th Cir.2012) (quoting *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir.2009)).

In *Klusmeier*, the Eleventh Circuit affirmed a district court's dismissal of a complaint for failure to state a claim, because "[r]elator's allegations fail to show that [defendant contractors'] monthly invoices actually induced a false or fraudulent request for payment." *Klusmeier*, 469 Fed. Appx. at 721. Instead, the court found the *Klusmeier* relator's complaint "merely speculate[d] that because [defendant] violated the contract in some instances, and because [defendant] submitted some invoices, false claims 'must have been submitted, were likely submitted or should have been submitted....'" *Id.* (quoting *Clausen*, 290 F.3d at 1311). Accordingly, the *Klusmeier* court declined to assume that the invoices produced represented actual bills submitted to the government for noncompliant work.

The *Klusmeier* court found invoices for non-governmental customers insufficient to establish the requisite particularity to demonstrate the submission of false claims. Likewise, here Relator merely provides a spreadsheet with overfill recapture data and "assumes that the overfill amounts reflected [in Exhibits A–C[10]]

---

10. Exhibit A to the Third Amended Complaint represents "[a]n example of the form on which the overfill percentage [of Epogen] was calculated and reported to corporate headquarters." (TAC ¶ 63; *see also* Ex. A, Doc. 95–1.) However, the Court notes that reporting to corporate headquarters does not neces-

sarily lead to the conclusion that Fresenius billed Medicare or that the Government reimbursed for this amount. Additionally, Exhibits B and C to the Third Amended Complaint may represent "monthly Epogen overfill amounts for all the clinics" and may "detail Fresenius's captur[ing] of overfill," but the

must have been billed to other entities, and assumes that some of those claims must have been submitted to government programs." (Resp. Opp. TAC at 15.) Though Relator suggests that Fresenius used this data to motivate its clinics via "congratulat[ions] in emails," "personal phone calls," or "pressure[ ] to improve their overfill recovery", (TAC ¶ 67), he establishes no link between overfill recapturing and any relevant financial information showing a bill submitted to the Government for ghost drug. Perhaps unintentionally, Relator seems to admit his conclusions are merely hypothetical: "[D]espite Fresenius's protestations that this could not happen, it *apparently* did ..." (Relator's Reply to Resp. Opp. to TAC at 5 n. 2, Doc. 121 (emphasis added).) The Court finds nothing *apparent* in Relator's Complaint or his supporting exhibits that Fresenius submitted bills to the Government for any non-existent Epogen.

The Eleventh Circuit's subsequent cases make clear, however, that courts may apply a somewhat more flexible, case-by-case approach to *Clausen*'s principles where the relator's complaint provides "indicia of reliability" that support the relator's allegations. *See generally Cade v. Progressive Cmty. Healthcare, Inc.*, No. 1:09–CV–3522–WSD, 2011 WL 2837648, at *3–7 (N.D.Ga. July 14, 2011) (Duffey, J.) (collecting and synthesizing Eleventh Circuit *qui tam* pleading cases); *see also U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 869 F.Supp.2d 1336, 1346 (M.D.Fla.2012) (finding that Plaintiff's complaint lacked sufficient indicia of reliability to excuse the failure to plead with specificity that the government was induced to reimburse because of defendant's use of a false statement).

Mr. Saldivar worked as an Equipment Technician and later Chief Technician with duties of "accounting for Zemplar vials, and later Epogen vials." (TAC ¶¶ 86, 89–90.) His job duties in these roles allowed him to base allegations of Counts 1–4, *inter alia*, "on information learned during his employment with Fresenius ... [in that] while creating monthly Zemplar reports, he observed that Zemplar overfill accounted for up to 30% of the total doses that Fresenius administered at clinics." *Saldivar*, 906 F.Supp.2d at 1270. The Court has already recognized Relator's first-hand knowledge for Counts 1 through 4. *See id.* at 1277.

While Relator Saldivar's inventory accounting duties provided him personal exposure to Fresenius's corporation-wide overfill recapturing scheme, his position as described in the Third Amended Complaint did not involve personally extracting overfill, observing the extraction of overfill, or administering or observing the administration of this allegedly *non-existent* overfill. (TAC ¶¶ 10, 86, 89–90, 93–101, 105–06.) Relator claims "the total administered dosages at a given clinic never equaled the total available drug amount from the clinic inventory" and that "[f]ar more dosages were always administered than the drug labeled volumes in inventory could provide." (TAC ¶ 103.) However, Relator admits that in September of 2009, when he was assigned the duty to track monthly Epogen usage, the forms that provided "all that was necessary from [Fresenius] clinics to allow the defendant to bill Medicare ... had been changed to prevent obvious detection of the overfill tracking." (*Id.* ¶¶ 121, 125–26.) As Fresenius has stated, in order to bill the government for non-existent overfill, it would

---

Court does not see how entries on a spreadsheet necessarily lead to the conclusion that these Exhibits also show "billings to Medi-

care." (TAC ¶¶ 64, 75; *see also* Ex. B, Doc. 95–2, and Ex. C, Doc. 95–3.).

have had to bill the government for drug that was never administered to a patient. (Resp. Opp. TAC at 16 ("The only way this alleged 'fraud' could happen is if a nurse intentionally refused to give a patient the amount of drug the doctor ordered and then falsely initiated billing for the ordered amount.").) Relator has failed to allege facts suggesting he had any first-hand knowledge that this occurred. Instead, his allegations supporting Counts 5 and 6 arise from misconstrued data.

Without personal knowledge, Relator Saldivar's allegations are insufficiently reliable to establish an alternative mechanism to anchor his allegations of a fraudulent billing scheme, especially given the Court's concerns about the plausibility of Counts 5 and 6. *See Corsello*, 428 F.3d at 1013 (finding relator's employment as a sales manager outside the billing department provided insufficient reliability to support his complaint's allegations that "many details of numerous schemes, employees, and claims ... resulted in the submission of fraudulent claims") (internal quotation omitted); *see also Cade*, 2011 WL 2837648, at *8–9 (finding relator office manager's 'observations' failed to demonstrate that her role in the billing process provided sufficient reliability as to her conclusions' credibility).

The Court finds Relator has failed to allege with particularity the presentment of a false claim for non-existent overfill to the government, and he has failed to allege any first-hand knowledge about recapturing and subsequently billing for non-existent overfill sufficient to support the allegations contained in Counts 5 and 6 of his Third Amended Complaint. Accordingly, Relator's Motion to Amend his Complaint to add Counts 5 and 6 pursuant to the *presentment* arm of the False Claims Act—31 U.S.C. 3729(a)(1)(A)—is **DENIED.**

*ii. Relator's Use Claim for Counts 5 and 6 Pursuant to 31 U.S.C. 3729(a)(1)(B)*

 To allege a use claim under 31 U.S.C. § 3729(a)(1)(B), a relator must allege (1) "that the defendant made a false record or statement" and (2) that the defendant "made [that] false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 666, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (internal quotations omitted). In *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318 (11th Cir.2009), the Eleventh Circuit clarified this pleading standard by requiring a plaintiff's complaint to show that "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Hopper*, 588 F.3d at 1327.

In *Hopper*, the relators claimed that defendants devised a scheme that "caused the government to pay false claims ... [for drugs] prescribed for off-label uses." *Id.* at 1322. Instead of alleging the defendant submitted false claims, the *Hopper* relators alleged "that every time federal funds were used to pay for an off-label prescription, the third party who requested payment from the government made a false claim ... because defendant intended that its campaign cause the filing of false claims." *Id.* However, the *Hopper* relators "[failed] to link the alleged false statements to the government's decision to pay false claims." *Id.* at 1331.

 Relator Saldivar suffers the same *use* infirmity as the *Hopper* relators; specifically, a failure to allege with particularity (or at all) that the Government found a

false statement material to its decision to provide reimbursement. *See Hopper*, 588 F.3d at 1329, 1330 (requiring more than a conclusory statement that a false statement "result in the use of Government funds to pay a false or fraudulent claim" without allegations that the false statement was material to the Government's decision on whether to pay the claim (quoting *Allison Engine*, 553 U.S. at 668, 128 S.Ct. 2123)). Like the *Hopper* plaintiff, Relator's complaint "fails to allege the defendant[ ] intended for the government to rely on the substance of their [inventory and overfill calculations] to decide to pay a claim." *Hopper*, 588 F.3d at 1330.

In addition, as with his presentment claim, Relator fails to allege sufficient firsthand knowledge to provide the indicia of reliability that might otherwise save his improperly pled complaint. *See supra* Part III.B.2.b.i. As a result, it appears to the Court that Relator simply cited the False Claims Act's *use* section in his Complaint, rather than pleading its elements with clarity or particularity or alleging firsthand knowledge of a false statement leading to the Government's approval of a false claim. Accordingly, Relator's Motion to Amend his Complaint to add Counts 5 and 6 pursuant to the *use* arm of the False Claims Act (31 U.S.C. 3729(a)(1)(B)) is **DENIED**.

In summary, regarding Counts 5 and 6,[11] Relator Saldivar described allegedly improper practices in a skeletal way, but he failed to allege with particularity that these improper practices led to the submission of a claim to the Government or that any false statements induced the Government to approve a false claim or make an excess payment on such claim. Accord-

ingly, Relator's Third Motion to Amend the Complaint as it relates to Counts 5 and 6 is **DENIED**.

### 3. Counts 7 and 8 (Anti-kickback Violations leading to FCA claims)

Relator next moves to amend his Complaint to add Counts 7 and 8. Count 7 alleges that "each claim for reimbursement related to Zemplar that was subject to and the product of illegal remuneration in violation of the Anti-kickback Statute 42 U.S.C. § 1320a–7b(b) is a false claim." (TAC ¶ 171.) Count 8 states the same allegation with respect to Epogen. (*Id.* ¶ 176.) As best the Court can discern, Relator appears to allege that by accepting "free" overfill, Fresenius violated the Anti-kickback Statute's prohibition against illegal remuneration. Relator then suggests that because compliance with the Anti-kickback Statute is a condition of reimbursement under the Medicare program, submitting a claim for kickback-tainted overfill is itself a false claim.

■■■ As an initial matter, Defendant correctly notes that Relator's Complaint is an impermissible shotgun pleading. Relator improperly incorporates all allegations into Counts 7 and 8, making it virtually impossible for the Court to determine which allegations Relator believes actually support these counts. (*See also supra* Part III.B.2.a, n. 7 (noting this issue in the context of Counts 5 and 6).) A plaintiff runs afoul of the requirements under Rules 8 and 10 of the Federal Rules of Civil Procedure when he presents the court with a "shotgun pleading," which is a pleading where the plaintiff has failed "to identify his claims with sufficient clarity to enable the defendant to frame a responsi-

---

**11.** Count 5's lack of particularity also applies to Count 6. Relator has not pleaded with sufficient particularity that the Government overpaid any "no-cost overfill-related reim-

bursements" for ghost drugs that Defendant is "obliged to refund." (TAC ¶ 167.) And Relator lacks the firsthand knowledge to provide any indicia of reliability to his claims.

ble pleading.'" *Holtz v. Harpagon Co., LLC,* No. 1:09–cv–03085, 2010 WL 2595075, at *4 (N.D.Ga. June 25, 2010) (Forrester, J.) (quoting *Sledge v. Goodyear Dunlop Tires N. Am., Ltd.,* 275 F.3d 1014, 1018 n. 8 (11th Cir.2001)). When a plaintiff presents a shotgun pleading, "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. District Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 366 (11th Cir.1996).

 The Court might be inclined to deny Relator's Motion on this ground alone, and direct Relator to replead his Third Amended Complaint to make clear what allegations support his claims in Counts 7 and 8 given the length and complexity of this Complaint. However, Defendant presents a separate, firmer ground for denying Relator's Motion as to Counts 7 and 8. Defendant asserts that Relator's Third Amended Complaint should also be denied because Relator's amendments exceed the scope of the Court's permission

granted to Relator to move to amend his allegations on a timely basis to describe a broader national billing scheme.[12] (Resp. Opp. TAC at 22–23). The Court finds this point meritorious.[13]

The Court did not grant Relator *carte blanche* leave to file a new complaint adding additional claims. Instead, based on Defendant's representation of its national corporate billing and use practices at issue, Relator was authorized "to conduct discovery as to anything that would relate to the *national policy* without going into all of the minutia of what's happening in lots of other clinics." (May 21 Conf., 17:9–17:12 (emphasis added).) The Court then contemplated a potential amendment arriving six months later, should discovery so merit. (*Id.* at 23:15–23:16.) Relator did not reference a possible kickback claim in conferences with the Court or allege in substantive terms a specific kickback violation in any of his previous Complaints. The only time Relator uses the word "kickback" in prior versions of his Complaint arises in broad background material allud-

**12.** Defendant raised undue delay concerns for the entire Third Amended Complaint. The Court found Counts 5 and 6 lacked particularity. *See supra* Part III.B.2.b. Therefore the Court does not consider whether Counts 5 and 6 were unduly delayed.

**13.** Defendant also argues that Counts 7 and 8 should be disallowed because (1) Relator fails to allege intent with particularity, (2) the counts are barred by the statute of limitations, and (3) the allegations are not pled with particularity. (Resp. Opp. TAC at 17, Doc. 98.) The Court finds these arguments unhelpful. First, plaintiffs may plead the scienter portion of fraud generally, provided other FCA elements are pleaded with particularity. *See Matheny,* 671 F.3d at 1224; Fed.R.Civ.P. 9(b). Second, FCA claims must arise within six years of the date of the violation or within three years after the material facts are known, not to exceed ten years after the incident's commission. 31 U.S.C. § 3731(b). Based on the date Relator's claim was filed, the statute of limitations would only bar any false claims

submitted before May 26, 2004. *See United States ex rel. Harris v. Lockheed Martin Corp.,* 905 F.Supp.2d 1343, 1356 (N.D.Ga.2012) (limiting the 10–year allowance to claims where the Government intervenes) (quoting *United States ex rel. Sanders v. N. Am. Bus. Indus.,* 546 F.3d 288, 294 (4th Cir.2008)) (citing *United States ex rel. Sikkenga v. Regence Bluecross Blueshield,* 472 F.3d 702, 725 (10th Cir.2006) and *United States ex rel. Olsen v. Lockheed Martin Corp.,* No. 1:09–cv–3083, slip op. at 12–13 (N.D.Ga. Sept. 17, 2010) (Carnes, J.)). Counts 7 and 8 include allegations of kickback schemes that were at least partially pursued within the requisite time frame. Third, Defendant's particularity argument against Counts 7 and 8 simply refers the Court to case law regarding shotgun pleadings. As the Court determines that undue delay justifies denial of Relator's Motion to Amend to add Counts 7 and 8, the Court need not address whether such counts are pled with sufficient particularity—an argument Defendant fails to develop in any case.

ing to a situation where manufacturers and providers could conceivably work in concert to defraud the Government:

As a marketing incentive and *kickback,* manufacturers of certain drugs, including Amgen (Epogen) and Abbott (Zemplar), *often* include volumes of drugs in vials that far exceed the nominal volume of those vials and far exceed what *might be* required to ensure that the nominal volume can be pulled by *practitioners* into syringes. That volume of overfill does not represent any additional cost to a *provider.* A provider *might* decide to administer overfill dosages (where not otherwise prohibited, *e.g.* in rules issued by the Centers for Disease Control and adopted by CMS), but it must avoid overpayment by Medicare to it by reducing the amount sought for reimbursement to reflect only actual costs incurred relative to vials actually used from inventory, and/or disclosing the overpayment to Medicare when it is learned of after the fact.

(SAC ¶ 37 (emphasis added).) This extremely general paragraph occurs in a section entitled "BACKGROUND" amidst other generic information apprising the Court about end-stage renal disease, dialysis, and federal reimbursement policies. Nothing specifically notified Defendant that this background information would later turn into a kickback claim, despite Relator's assertion that "the proposed TAC fleshes out *allegations* that were contained in Paragraph 37 of the SAC, that the free overfill in Epogen and Zemplar was a kickback." (Relator's Mem. Supp. TAC, Doc. 92–1, at 5 (emphasis added).) Relator hardly gave notice in his first Complaint or Second Amended Complaint, and barely provides any additional information in the Third Amended Complaint that would inspire the Court to read an *allegation* into paragraph 37. As such, the Court hesitates to deem "kickback" a suffi-

ciently magical word to consider its mention in "BACKGROUND" material some sort of incantation alleging a violation.

Defendant also raises valid concerns about adding new claims at this late juncture. "The support for these new allegations goes well-beyond establishing that Fresenius administered and billed Medicare for doses including overfill, and into Fresenius's business relationship with drug manufacturers and the laws that govern those relationships ..." (Resp. Opp. TAC. at 10–11.) The Court takes seriously the additional time and expense required to conduct such expansive discovery. Indeed, allowing these amendments now, on the eve of the Court's decision on the parties' first round of summary judgment briefing, would unduly delay this case.

■■■ Undue delay provides sufficient grounds to deny motions to amend. *See Carruthers v. BSA Adver., Inc.,* 357 F.3d 1213, 1218 (11th Cir.2004) (finding no abuse of discretion when plaintiff provided no explanation "why the interests of justice required leave to amend ... [or] why she could not have discovered and pled [her claim] in her original complaint or in her first amended complaint."). Relator does not provide any explanation *why* he did not include Counts 7 and 8 in his original complaints, so the Court has no reason to conjure merit into his delay. *See Jenkins v. Wholesale Alley, Inc.,* No. 1:05–cv–3266–JEC, 2006 WL 2716091, at *7 (N.D.Ga. Sept. 22, 2006) (Carnes, J.) (expressing disfavor for plaintiff's failure to explain why the Court should allow his amendment but denying the request on other grounds).

■■■ When the Government declined to intervene in March of 2011, Relator had full control of how this case would progress. Since that time, he filed his Second

Amended Complaint, which contained no mention of any anti-kickback breaches, and a proposed Third Amended Complaint on April 23, 2012 containing identical language (Doc. 62). However, neither of these Complaints contained anything but a perfunctory mention of a kickback claim. Further, Relator does not argue that the kickback scheme made itself known only through court-authorized discovery. *See Jenkins,* 2006 WL 2716091, at *7 ("Plaintiff was not apprised of new information during the course of discovery that would have triggered this new cause of action ... [and] did not seek to add this claim until six months after he filed the lawsuit. This tardiness constitutes undue delay."). Thus, the Court **DENIES** Relator's Third Motion to Amend the Complaint to the extent he seeks to add Counts 7 and 8.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Relator's Motion for Leave to File a Third Amended Complaint [Doc. 92]. Relator is granted leave to file the Third Amended Complaint as it relates to Counts 1–4 and Count 9. The Relator is denied leave to file a Third Amended complaint as it relates to Counts 5–8. However, to provide sufficient clarity, the Relator is **DIRECTED** to replead his Complaint so that current Count 9 (the retaliation claim) is renumbered as Count 5 and to remedy the shotgun pleading deficiency the Court identified in this Order. Relator shall file this modified Third Amended Complaint within fourteen (14) days of the entry date of this Order.